Filed: 4/25/2023 9:16 AM
Michael Gould
District Clerk
Collin County, Texas
By Rachel Ball Deputy
Envelope ID: 74978555

CAUSE NO. 471-02044-2023

| | |
|---|---|
| LEIGH-ANNE ZUELA, JEREMY ANDERSON, and ROBYN O'REAR, | IN THE DISTRICT COURT |
| Plaintiffs, | COLLIN COUNTY, TEXAS |
| vs. | |
| B. BRAUN MEDICAL, INC.; and DOES 1-50, | _____ JUDICIAL DISTRICT |
| Defendants. | |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs, Leigh-Anne Zuela, Jeremy Anderson, Robyn O'Rear (Collectively "Plaintiffs"), complain against Defendants, and each of them, for Religious Discrimination – Violation of Labor Code Section 21.051, et seq.; Religious Discrimination – Failure to Provide Reasonable Accommodation – Violation of Labor Code Section 21.108; and Retaliation – Violation of Labor Code Section 21.055 and in support thereof respectfully shows the following:

## DISCOVERY CONTROL PLAN

1.     Pursuant to Rule 190.3, discovery in this suit is intended to be conducted under Level 2.

## PARTIES

2.     Plaintiff, Leigh-Anne Zuela, is and was at all times relevant to this action an employee of Defendants as defined by Texas Labor Code section 21.002 (7), and a resident of Travis County, State of Texas.

3.     Plaintiff, Jeremy Anderson, is and was at all times relevant to this action an employee of Defendants as defined by Texas Labor Code section 21.002 (7), and a resident of Collin County, State of Texas.

4.     Plaintiff, Robyn O'Rear, is and was at all times relevant to this action an employee of Defendants as defined by Texas Labor Code section 21.002 (7), and a resident of Denton

1

County, State of Texas.

5.      Defendant, B. Braun Medical, Inc. ("B. Braun") is a Pennsylvania corporation with a principal place of business in Dallas County, State of Texas, where it operated as a qualified employer and in fact employed Plaintiffs pursuant to Texas Labor Code section 21.002 (8) and conducted business at all relevant times stated herein.

6.      Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these defendants by fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

7.      Plaintiffs are informed and believe and thereon alleges that at all times mentioned herein, each of the fictitiously named Defendants is negligently or otherwise responsible in some manner, along with the named Defendants, for the occurrences herein alleged, and Plaintiffs' damages as herein alleged were legally and proximately caused by the acts and/or omissions of both the named and fictitiously named defendants.

8.      Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, the Defendants named in this action, as well as the fictitiously named Defendants, and each of them, were agents and employees of the remaining Defendants, and in doing the things hereinafter complained of, were acting within the course and scope of such agency and/or employment and with the knowledge and consent of the remaining Defendants.

## JURISDICTION & VENUE

9.      This Court has original jurisdiction of the claims arising under the Texas Labor Code §§ 21.001 *et seq*.

10.     Venue is proper in this judicial district, pursuant to Texas Civil Practice and Remedies Code § 15.002.  One or more of the Defendants resides within and/or does business within the Dallas County, State of Texas, and all acts and omissions giving rise to liability are alleged to have occurred in Dallas County, State of Texas, making this Court the proper venue for Plaintiffs' claims.

///

///

2

**COMPLAINT FOR DAMAGES**

## ADMINISTRATIVE REMEDIES

11.     Each Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

12.     Plaintiffs each timely filed charges with the Texas Workforce Commission ("TWC") against the named Defendant B. Braun for the wrongful acts alleged herein.

## FACTS COMMON TO ALL CAUSES OF ACTION

### Scope of Mandatory Vaccination Mandate

13.     On September 10, 2021, Defendant B. Braun informed Plaintiffs that it would be requiring most field based and customer facing colleagues across the region to be fully vaccinated for COVID-19. The requirement for vaccination included those employees in sales, clinical educators, clinical nurse consultants, clinical applications specialist, service technicians, marketing product managers, and marketing project managers or other employees who are required to visit customers as part of their normal job responsibilities. The mandate required full vaccination against COVID-19 as part of Plaintiffs' job responsibilities no later than Monday, November 1, 2021.

14.     Defendant B. Braun also sent the Plaintiffs a COVID-19 Vaccine Requirement Frequently Asked Questions handout (FAQ) which clearly indicated that exemptions for the COVID-19 vaccine mandate would be allowed for medical and religious reasons. Defendant B. Braun committed to engaging in the interactive process to determine whether reasonable accommodations were available. The FAQ worksheet also indicated that failure to be fully vaccinated or have a valid exemption by November 1, 2021, would result in termination effective November 2, 2021.

15.     Each Plaintiff requested an exemption from the B. Braun COVID-19 vaccination policy as a reasonable accommodation to their sincerely held religious beliefs. Each of these employees received a similar denial of the request stating in part:

> You have asked to be permitted to work unvaccinated due to your religious beliefs and we have carefully considered your request. However, we are unable to approve your accommodation request, because, among other reasons, there is no accommodation available that would enable you to conform with your stated

3

religious beliefs and meet our job requirements without imposing undue hardship or risking the health and safety of fellow employees, customers, patients and/or members of the public. **As such, we are unable to approve your request and expect that you will come into compliance with our vaccination requirement and submit your vaccination card by November, 2021.**

**Please respond to me by October 15, 2021**, with your plans for complying with our COVID-19 vaccination policy. Failure to comply with our vaccination requirement will result in termination of your employment. (Emphasis in original.)

16.     The blanket denial to Plaintiffs' requests for an exemption evidences an intentional disregard of the requests and clearly constitutes of violation of these employees' rights under state law, as shown below.  The denial does not address whether the employee stated a sincerely held religious belief in opposition to the mandate.  The denial does not provide information why the Defendant could not provide a reasonable accommodation. The denial fails to provide any information on how an accommodation would cause an undue hardship.  The denial does not reference any legal authority or factual basis to support its denial.  These facts and others highlight the malicious and reckless intent behind B. Braun's denial letters.

**Scope of Requests for Exemption Based on Religious Beliefs and B. Braun's Denial to the Requests**

17.     As stated, B. Braun completely failed to address the sincerity of religious beliefs presented by the employees with their requests for exemption.

18.     Texas Labor Code §§ 21.001 *et seq.* provide broad workplace protections for people of sincere religious faith. For instance, it is generally unlawful for an employer to exclude or to suspend an employee, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin. Within this framework, the Labor Code also requires an employer to reasonably accommodate an employee's sincere religious beliefs, observances and practices, unless such an accommodation would impose an undue hardship.

19.     "Religion" in the employment context is generally defined as all aspects of religious observance and practice, as well as belief. In view of this broad definition, an employer covered by Texas Labor Code §§ 21.001 *et seq.* may not legally or constitutionally require an employee to belong to any "bona-fide" religious organization as a condition for receiving an accommodation. At the very most, an employer may only require that an employee's asserted religious beliefs be

4

**COMPLAINT FOR DAMAGES**

1  sincere. Accordingly, while the employer may compel an employee to articulate what his/her
2  religious beliefs are, the employer is prohibited from requiring the employee to prove that such
3  beliefs are logical, widely acceptable, consistent, or even comprehensible.

4      20.     Also, the employer may not require a strictly theistic definition of religion. A belief
5  in a supreme being is not required. Among the factors to be considered are whether the belief
6  system occupies in a person's life a place parallel to that of God in recognized religions and whether
7  it addresses ultimate concerns thereby filling a void in the individual's life.

8      21.     Historically, the United States Supreme Court at first adopted a theistic definition
9  of religion. In the nineteenth century, for example, in *Davis v. Beason* (1890) 133 U.S. 333, 342,
10  the court stated: "The term 'religion' has reference to one's views of his relations to his
11  Creator, and to the obligations they impose of reverence for his being and character, and of
12  obedience to his will." Later, however, the United States Supreme Court took a more expansive
13  view of religion. In *Torcaso v. Watkins* (1961) 367 U.S. 488, 495, for example, the court noted
14  that neither a state nor the federal government can constitutionally "aid those religions based on a
15  belief in the existence of God as against those religions founded on different beliefs."

16      22.     The United States Supreme Court has recognized that the task before the courts is
17  not to reject incomprehensible beliefs, but "to decide whether the beliefs professed by a registrant
18  are sincerely held and whether they are, in his own scheme of things, religious." *United States v.*
19  *Seeger* (1965) 380 U.S. 163, 185.

20      23.     An employer may not require an employee to waive nor limit their right to an
21  accommodation without the employee's express consent. It is therefore wrong for the employer to
22  presume that it is legally empowered to restrict religious accommodations to only those employees
23  who can "empirically prove" that they are members of a religious organization with traditional
24  tenets against vaccines. Allowing B. Braun to make such a restriction is necessarily discriminatory,
25  and a violation of state and federal law.

26      24.     The sincerity of an employee's stated religious belief is usually not in dispute and
27  is generally presumed or easily established.  Employers are not and should not be in the business
28  of deciding whether a person holds religious beliefs for the proper reasons and they should limit

COMPLAINT FOR DAMAGES

the inquiry to whether or not the religious belief system is sincerely held; and should not review the motives or reasons for holding the belief in the first place. B. Braun is not permitted to determine which religious adherent has a "correct" or "proper" or "valid" understanding of religious doctrine, or whether any employee's sincerely held religious beliefs are shared broadly among other faithful. Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit legal protection. Additionally, though membership in or adherence to the tenets of an organized religion is plainly sufficient to provide protection for an individual's sincerely held religious beliefs, it is not a necessary precondition.

25.    In fact, the law provides protection for sincerely held religious beliefs even when some members of the same religious organization, sect, or denomination disagree with the beliefs espoused by the individual. That some individuals may have sincerely held religious beliefs which differ from those sincerely held by other B. Braun employees requesting accommodation is irrelevant to whether the employee's sincerely held religious beliefs are entitled to protection.

**Each of the Plaintiffs Adhere to a Belief System that Derives from a Power / Being / Faith to Which all Else is Subordinate or Upon Which all else Depends.**

26.    Each of the Plaintiffs adheres to Christianity – a faith system that is derived from God in the form of the Trinity. God is the omniscient, omnipotent and omnipresent Being upon which all else is subordinate or upon which all else depends.

27.    Plaintiffs believe and live by the first of God's Commandments which states, "I am the Lord your God ... you shall have no other God's before Me." (Exodus 20:2-3.) For these Plaintiffs, all other authority and guide is subordinate to God. God's authority over all is proclaimed throughout the Bible from Genesis 1:1 to Revelations 22:21. More specifically, God's authority over all things is exemplified in His creation of Heaven and Earth and all that is in them. Genesis 1 tells us:

> **1** In the beginning God created the heavens and the earth. **2** And the earth was a formless and desolate emptiness, and darkness was over the surface of the deep, and the Spirit of God was hovering over the surface of the waters. **3** Then God said, "Let there be light"; and there was light. **4** God saw that the light was good; and God separated the light from the darkness. **5** God called the light "day," and the

**COMPLAINT FOR DAMAGES**

darkness He called "night." And there was evening and there was morning, one day.
[6] Then God said, "Let there be an expanse in the midst of the waters, and let it separate the waters from the waters." [7] God made the expanse, and separated the waters that were below the expanse from the waters that were above the expanse; and it was so. [8] God called the expanse "heaven." And there was evening and there was morning, a second day.
[9] Then God said, "Let the waters below the heavens be gathered into one place, and let the dry land appear"; and it was so. [10] And God called the dry land "earth," and the gathering of the waters He called "seas"; and God saw that it was good. [11] Then God said, "Let the earth sprout vegetation, plants yielding seed, *and* fruit trees on the earth bearing fruit according to their kind with seed in them"; and it was so. [12] The earth produced vegetation, plants yielding seed according to their kind, and trees bearing fruit with seed in them, according to their kind; and God saw that it was good. [13] And there was evening and there was morning, a third day.
[14] Then God said, "Let there be lights in the expanse of the heavens to separate the day from the night, and they shall serve as signs and for seasons, and for days and years; [15] and they shall serve as lights in the expanse of the heavens to give light on the earth"; and it was so. [16] God made the two great lights, the greater light to govern the day, and the lesser light to govern the night; *He made* the stars also. [17] God placed them in the expanse of the heavens to give light on the earth, [18] and to govern the day and the night, and to separate the light from the darkness; and God saw that it was good. [19] And there was evening and there was morning, a fourth day.
[20] Then God said, "Let the waters teem with swarms of living creatures, and let birds fly above the earth in the open expanse of the heavens." [21] And God created the great sea creatures and every living creature that moves, with which the waters swarmed, according to their kind, and every winged bird according to its kind; and God saw that it was good. [22] God blessed them, saying, "Be fruitful and multiply, and fill the waters in the seas, and let birds multiply on the earth." [23] And there was evening and there was morning, a fifth day.
[24] Then God said, "Let the earth produce living creatures according to their kind: livestock and crawling things and animals of the earth according to their kind"; and it was so. [25] God made the animals of the earth according to their kind, and the livestock according to their kind, and everything that crawls on the ground according to its kind; and God saw that it was good.
[26] **Then God said, "Let Us make mankind in Our image, according to Our likeness**; and let them rule over the fish of the sea and over the birds of the sky and over the livestock and over all the earth, and over every crawling thing that crawls on the earth." [27] **So God created man in His own image, in the image of God He created him; male and female He created them. [28] God blessed them; and God said to them, "Be fruitful and multiply, and fill the earth, and subdue it;** and rule over the fish of the sea and over the birds of the sky and over every living thing that moves on the earth." [29] Then God said, "Behold, I have given you every plant yielding seed that is on the surface of all the earth, and every tree which has fruit yielding seed; it shall be food for you; [30] and to every animal of the earth and to

COMPLAINT FOR DAMAGES

every bird of the sky and to everything that moves on the earth which has life, *I have given* every green plant for food"; and it was so. **³¹ And God saw all that He had made, and behold, it was very good.** And there was evening and there was morning, the sixth day. (Emphasis added.) (Genesis 1 (NAS).)

28.    The Bible states, "In the beginning was the Word, and the Word was with God, and the Word was God" (John 1:1). Plaintiffs believe the Bible is the infallible and authoritative Word of God provided to all people as guidance on how to live to bring glory to God. II Timothy 3:16 states, "All scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction, for instruction in righteousness." Plaintiffs live by its divine inspiration and accept its teachings as authority in all matters of faith and practice. (Deuteronomy 6:4-9; Proverbs 3:1-6; Psalm 119:89, 105; Isaiah 48:12-16; Romans 8:14-17; II Timothy 2:15, 3:16-17.)  The Bible is foundational to their faith, and they try to live their lives accordingly. For these Plaintiffs, all things are subordinate to, and all depend on the Word of God.

29.    The Bible declares that God's followers are not to submit to any governing authority or policy that is not submissive to God's word. (Book of Daniel, Esther 4:11-7:3, Acts 5:27-29 & 1 John 2:4). They are to keep God's commands even in the face of policy that forbids it, (Daniel 6:7-10) and they are not to define themselves with things of the culture that contradict God (Daniel 1:8).   Where Scripture does not expressly instruct on a particular matter, Plaintiffs believe that they are required to search the Scripture for themselves for related truths. (Romans 15:4) and to seek personal guidance from the Holy Spirit (Acts 2:38-39; Romans 8).

**Plaintiff's Belief / Faith in God Address Fundamental or Ultimate Questions.**

30.    For the Plaintiffs, they believe in Jesus Christ as their Savior and Lord.  "For all have sinned and fall short of the Glory of God." (Romans 3:23).   "For God so loved the world, that He gave His only begotten Son, that whoever believes in Him will not perish but have eternal life." (John 3:16).    "For by grace you have been saved through faith;  and this *is* not of yourselves, *it is* the gift of God; not a result of works, so that no one may boast." (Ephesians 2: 8-9). Jesus also declared "I am the way and the truth and the life, no one comes to the Father but through me." (John 14:6). Jesus came to live the example of love and grace and He promised a Helper to remind us of His teachings and to guide those to live as He instructed. "However, the Helper, the Holy Spirit, whom the Father will send in my name, will teach you everything. He will

8

1    remind you of everything that I have ever told you." (John 14: 26). To bring glory to God—that
2    is, to exalt him, lift him up, give him praise, to reflect upon him honorably—is in fact Plaintiffs'
3    purpose in life.

4           31.     For Plaintiffs, Genesis 1: 27-28 makes clear, "So God created man in His own
5    image, in the image of God He created him; male and female He created them. God blessed them;
6    and God said to them, "Be fruitful and multiply, and fill the earth, and subdue it." The Bible also
7    outlines the fact that God created the body both "fearfully and wonderfully". (Psalm 139:13-16).
8    As a creation of God, Plaintiffs believe that human life should be valued and considered as sacred
9    and God-given.

10          32.     God created humankind to live and enjoy relationship as He does. Jesus said, "I
11   have told you this so that my joy may be in you and that your joy may be complete." (John 15:11).
12   God in effect is saying, "Become intimate with me, allow my joy to be in you, and through our
13   close relationship you will experience the true joy of living, for you will bear the fruit of my
14   nature—love, joy, peace, patience, kindness, goodness, faithfulness, gentleness, and self-control.
15   (See Galatians 5:22-23). And in doing so you will reflect my presence and give me glory!"

16          33.     God's Word ("Scripture") states, "Everything comes from him and exists by his
17   power and is intended for his glory" (Romans 11:36). "Give to the Lord the glory he deserves" (I
18   Chronicles 16:29). The Bible admonishes us to "do it all for the glory of God" (I Corinthians
19   10:31), "so that in all things God may be glorified." (I Peter 4:11). "In view of this I also do my
20   best to maintain a blameless conscience *both* before God and before *other* people, always." (Acts
21   24:16). God's Word provides believers the confidence to act on their conscience when there is no
22   specific reference on how to act.

23          34.     Christianity teaches each Plaintiff through the Bible that life is sacred in its creation
24   and that life begins at conception. Plaintiffs believe in the sacred nature of life.

25          35.     Scripture reveals that God knows us even before we are conceived. "The word of
26   the Lord came to me, saying, 'Before I formed you in the womb I knew you, before you were born,
27   I set you apart; I appointed you as a prophet to the nations.'" (Jeremiah 1:4 – 5). "For you created
28   my inmost being, you knit me together in my mother's womb. I praise you because I am fearfully

9

**COMPLAINT FOR DAMAGES**

1    and wonderfully made; your works are wonderful; I know that full well. My frame was not hidden

2    from you when I was made in the secret place, when I was woven together in the depths of the

3    earth. Your eyes saw my unformed body; all the days ordained for me were written in your book

4    before one of them came to be." (Psalm 139:13 – 16)

5         36.    Psalm 139:13-16 reveals, "…thou hast covered me in my mother's womb. I will

6    praise thee; for I am fearfully and wonderfully made…".

7         37.    Plaintiffs believe in the sacred nature of life and the commands against taking a

8    human life created by God (abortion) are discussed throughout the Bible. The Bible states murder,

9    the taking of human life, is a sin in the Ten Commandments ("You shall not murder" [Exodus

10   20:13]). In Proverbs 6:16-17 it states, "There are six things the Lord hates…" one of them being,

11   "…hands that shed innocent blood." In addition, Jesus said, "Even so it is not the will of your

12   Father in Heaven that one of these little ones should perish." (Matthew 18:14). Psalm 127:3 says

13   that "Children are a heritage from the LORD, offspring a reward from him." Abortion is the taking

14   of a life and is prohibited. (Exodus 20:13; Psalm 139:13-16; Jeremiah 1:5; Isaiah 49:15.)

15        38.    In addition, because of Plaintiffs' deeply held beliefs, each acknowledges God's

16   perfect design of their body, and that their body is the temple for His Spirit. The Bible states that

17   the body is the Temple of the Holy Spirit. We are commanded to take good care of it, not to defile

18   it. (1 Corinthians 6:19-20, 2 Corinthians 5:10, and 2 Corinthians 7:1). 1 Corinthians 3:16-17 states,

19   "Don't you know that you yourselves are God's temple and that God's Spirit dwells in your midst?

20   If anyone destroys God's temple, God will destroy that person; for God's temple is sacred, and

21   you together are that temple." In addition, 1 Corinthians 6:19-20 states, "Do you not know that

22   your bodies are temples of the Holy Spirit, who is in you, whom you have received from God?

23   You are not your own; you were bought at a price. Therefore, honor God with your bodies."

24   Furthermore, the Bible encourages bodily autonomy and abstinence from contaminating the body

25   with substances that may be threatening to one's bodily health.

26   **Sincerely Held Religious Beliefs Conflicting with the COVID-19 Vaccine**

27        39.    Plaintiffs' faiths/creeds/beliefs discussed above conflict with the work requirement

28   to receive the COVID-19 vaccine. Each Plaintiff requested accommodations stating various

10

**COMPLAINT FOR DAMAGES**

sincerely held religious beliefs as described herein and including, but not limited to, life is sacred from the moment of conception to natural death, taking an innocent life is a grievous wrong, being required to benefit from the taking of a life creates an irreconcilable conflict between the Plaintiffs' faiths/creeds/beliefs and the work requirement; and their bodies are temples of the Holy Spirit and they are to avoid defiling the temple of the Holy Spirit as would occur by taking the COVID-19 shot.

40.    All three of the currently available COVID-19 vaccines were developed and produced from, tested with, researched on, or otherwise connected with fetal cell lines from aborted babies. J&J used an aborted fetal cell line in manufacturing its COVID-19 vaccine, while Moderna and Pfizer used aborted fetal cell lines in testing of their vaccines.[1]

41.    The use of the COVID-19 vaccines, which involved the use of cells from aborted babies in the research, testing, and/or development of the vaccines, is morally unacceptable to Plaintiffs. Plaintiffs do not believe that using fetal cells from an aborted baby for the benefit of the greater good or their personal benefit can be reconciled with their faith/creed/beliefs. They cannot knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn. Receiving a vaccine in any connected to abortion would be complying with an action the Bible says the Lord hates.

42.    It is the sincerely held religious belief of many Plaintiffs that, in being vaccinated with any of the currently available COVID-19 vaccines, they would be benefiting from, cooperating with and/or complicit in abortion -- the ending of an innocent human life -- and that such would constitute a sin against God and a violation of His Commandments, for which they would be held morally accountable to God.

43.    In addition, the COVID-19 shots work as gene therapy. By manipulating genetic operations, the COVID-19 shots alter the human image of what God created in the beginning (literally assuming the position of God). Plaintiffs believe based on the foregoing that accepting the COVID-19 shot would constitute a sinful practice under these circumstances.

[1] See James Lawler, MD, You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells" Nebraska Medicine, August 4, 2021, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells.

11

**COMPLAINT FOR DAMAGES**

44.   The COVID-19 shots (by the very disclosure of the vaccine manufacturers) also contain some or all of the following: carcinogens, neurotoxins, animal viruses, animal blood, allergens, and heavy metals. Plaintiffs believe accepting the COVID-19 shot into their body, a substance that has not been proven to be safe and effective, would cause them to defile their bodies in violation of their sincerely held religious beliefs. The COVID-19 shots have not been subject to longitudinal studies or research and over time the COVID-19 vaccine is proving to be more likely harmful to the body than good.  For example, taking the COVID-19 shot has been shown to cause serious and lasting damage to the reproductive ability of both women and men. The significant potential of harm to Plaintiffs' bodies from the COVID-19 shot are well documented through VAERS. As such, introducing this shot into their bodies violates their life commitment to their faith/belief/creed as stated above. On the contrary, the survival rate for COVID-19 is 99.98%

45.   Plaintiffs' sincerely held religious beliefs compel them to avoid introducing unnecessary substances and chemicals of all kinds into their body and to abstain from accepting or injecting any of these products into their bodies, regardless of the perceived benefits or rationales. Thus, while there may be some faith leaders and other adherents whose beliefs from Scripture and Holy Spirit are different, and who may be willing to accept one of the three currently available COVID-19 shots despite their connection with aborted fetal cell lines and the contamination the shot present to the body, any B. Braun employee is entitled to interpret the Scriptural and Holy Spirit commands differently.

46.   The denial of any employee's request for a religious accommodation based upon the views of other individuals who do not share the employee's beliefs is unlawful. In fact, it is legally irrelevant what other individuals think or religiously believe. Nor does an employee's religious objection to a vaccine need to be unique to be personal and sincerely held. On the other hand, each Plaintiff's religion/creed/belief is no less sincere because another Plaintiff submitted a request for exemption containing the same sincerely held beliefs as another. Once an employee has articulated the employee's sincerely held religious objections to the currently available COVID-19 vaccines, whether those objections are the same as or nothing like any other person's objections, the proper inquiry is at its end.

12

**COMPLAINT FOR DAMAGES**

47.     Plaintiffs submitted requests for religious accommodation providing B. Braun notice that accepting or receiving any of the three currently available COVID-19 vaccines would be a violation of their sincerely held religious beliefs. These requests for accommodations stated various sincerely held religious beliefs including, but not limited to, life is sacred from the moment of conception to natural death, taking an innocent life is a grievous wrong, being required to benefit from the taking of a life creates an irreconcilable conflict between the belief and the work requirement of COVID-19 vaccination, and their bodies are temples of the Holy Spirit and that to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the temple of the Holy Spirit.

**B. B. Braun's Failure to Engage in the Interactive Process and to Provide a Reasonable Accommodation**

48.     In issuing its denial letter, B. Braun claims that it cannot provide an accommodation to the plaintiffs due to the undue hardship presented by the requests.

"Undue hardship" means significant difficulty or expense and focuses on the resources and circumstances of the particular employer in relationship to the cost or difficulty of providing a specific accommodation. Undue hardship is typically considered in light of the following factors:
(1) The nature and cost of the accommodation needed.
(2) The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility.
(3) The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.
(4) The type of operations, including the composition, structure, and functions of the workforce of the entity.
(5) The geographic separateness or administrative or fiscal relationship of the facility or facilities.

49.     As to what an "undue hardship" entails, an employer must either provide factual evidence that co-workers of an accommodated employee will be significantly imposed upon, or that a material disruption of the work routine will occur. Mere hypothetical scenarios of what could happen if an employee is granted an accommodation are wholly insufficient. If the employee

13

1    proves a prima facie case and the employer fails to initiate an accommodation for the religious

2    practices, the burden is then on the employer to prove it will incur an undue hardship if it

3    accommodates that belief.

4        50.    When the defendant claims accommodating the employee's religious beliefs would

5    create an undue hardship to the operation of its business, the defendant must prove that it

6    considered reasonable alternative options for accommodating the religious belief, including mask

7    wearing and testing in this case, and it did not adopt such measures because it would be

8    significantly difficult or expensive.

9        51.    B. Braun completely fails to provide factual evidence to support a claim of undue

10   hardship and in so doing fails to identify any condition or circumstance that satisfies the definition

11   of undue hardship. B. Braun fails to point to a single action requiring significant difficulty or

12   expense. B. Braun fails to identify these conditions because they are not present. And to the extent

13   B. Braun later tries to take the position of undue hardship, it would do so despite the fact that health

14   care facilities and businesses across the state provided testing and masks as reasonable

15   accommodations consistent similar mandates and exemption requirements. Also, testing and mask

16   wearing does not present an undue hardship because B. Braun and other employers throughout the

17   state have been doing it since the beginning of COVID-19 either in the form of screenings and/or

18   testing and/or mask wearing.

19       52.    Further evidence of B. Braun's discrimination with these denials is present in B.

20   Braun's turning a blind eye to the current state of the science which clearly indicates that

21   vaccinated individuals spread COVID-19 just the same as unvaccinated individuals.

22       53.    Compelling evidence that vaccinated individuals pose the same risk of transmission

23   as unvaccinated individuals and that safety protocols have helped to partially control transmission

24   by both vaccinated and unvaccinated individuals comes straight from Anthony Fauci, M.D. In an

25   article co-authored by Dr. Fauci and published in the New England Journal of Medicine on

26   December 15, 2021, Dr. Fauci admits "In the United States, the Covid-19 pandemic has been

27   partially controlled by standard public health measures such as social distancing, masking,

28   isolating sick and exposed people, closing places where people congregate in close quarters, and

**COMPLAINT FOR DAMAGES**

other measures, as well as by SARS-CoV-2 vaccines (two messenger RNA vaccines and one adenovirus-vectored vaccine). As important as these vaccines are, however, their protective efficacy wanes over time, necessitating booster doses. *Vaccination has also been unable to prevent "breakthrough" infections, allowing subsequent transmission to other people* even when the vaccine prevents severe and fatal disease."[2] (Emphasis added.)

54.    Further compelling evidence that vaccinated individuals pose the same risk of transmission as unvaccinated individuals comes from Rochelle Walensky, Director of the Centers for Disease Control ("CDC"). Director Walensky met with Wolf Blitzer to discuss COVID-19 issues. In this CNN interview, Director Walensky states in no uncertain terms that individuals vaccinated for COVID-19, while having less symptoms, can still become infected with and transmit the virus. Director Walensky was asked by Wolf Blitzer: "You get COVID, you're fully vaccinated, but you are totally asymptomatic, you can still pass on the virus to someone else, is that right?" Director Walensky answered "That is exactly right." Director Walensky elaborated by noting the vaccines help with regard to reducing the severity of the symptoms for those who catch COVID-19 *"but what they can't do anymore is prevent transmission."*[3]

55.    The CDC also reports that "During July 2021, 469 cases of COVID-19 associated with multiple summer events and large public gatherings in a town in Barnstable County, Massachusetts, were identified among Massachusetts residents; vaccination coverage among eligible Massachusetts residents was 69%. Approximately three quarters (346; 74%) of cases occurred in fully vaccinated persons (those who had completed a 2-dose course of mRNA vaccine [Pfizer-BioNTech or Moderna] or had received a single dose of Janssen [Johnson & Johnson] vaccine ≥14 days before exposure). Overall, 274 (79%) vaccinated patients with breakthrough infection were symptomatic. Among five COVID-19 patients who were districtized, four were fully vaccinated."[4] In short, the study found that *three-quarters of cases occurred in fully*

---

[2] https://www.nejm.org/doi/pdf/10.1056/NEJMp2118468?articleTools=true
[3] https://www.youtube.com/watch?v=TKFWGvvlVLI (August 6, 2021, CDC Director, in an interview with CNN's Wolf Blitzer, starting at time mark 0:56 to 1:56.
[4] https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w

**COMPLAINT FOR DAMAGES**

1    *vaccinated people.* Massachusetts had a high rate of vaccination: about 69% among eligible adults

2    in the state at the time of the study.

3         56.    The CDC also found no significant difference in the viral load present in the

4    breakthrough infections occurring in fully vaccinated people and the other cases, *suggesting the*

5    *viral load of vaccinated and unvaccinated persons infected with the coronavirus is similar.*[5]  On

6    July 27, 2021, CDC released updated guidance and a recommendation for everyone to wear a mask

7    in public indoor places, even if they are fully vaccinated.[6]

8         57.    With this information, it is clear that vaccinated employees present the same risk of

9    infection to patients as unvaccinated and yet, B. Braun claims that the only possible way to present

10   a safe environment is to remove unvaccinated people from the facilities.  B. Braun's claim is belied

11   by the fact that hundreds of businesses, hospital, schools, churches across the State of Texas

12   continued to allow unvaccinated individuals to work so long as they worked with certain safety

13   protocols such as, testing and mask wearing. B. Braun's claim of undue hardship is nothing more

14   than veiled discrimination against those individuals who sought an exemption from the vaccine

15   based on religious or medical reasons.

16        58.    B. Braun's malicious and reckless actions are causing intense undue stress for its

17   former employees who were forced to choose between keeping their jobs, which they love, and

18   honoring their most deeply held religious beliefs about life, purpose, and death. B. Braun's

19   obstructive and cavalier handling of these employees' religious and medical exemption requests is

20   escalating the stress of these former employees each day.

21   ///

22   ///

23   ///

24   ///

25   ///

26

27   [5] https://www.npr.org/sections/coronavirus-live-updates/2021/07/30/1022867219/cdc-study-provincetown-delta-vaccinated-breakthrough-mask-guidance

28   [6] https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html#:~:text=%E2%80%A2%20Fully%20vaccinated%20people%20with,the%20virus%20to%20others.

**COMPLAINT FOR DAMAGES**

## FIRST CAUSE OF ACTION

## RELIGIOUS DISCRIMINATION – VIOLATION OF LABOR

## CODE §§21.051 ET. SEQ

### [Against All Defendants]

59.    Plaintiffs hereby reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

60.    It is an unlawful employment practice, for an employer or other entity covered by this part to refuse to hire or employ a person or to refuse to select a person for a training program leading to employment or to bar or to discharge a person from employment or from a training program leading to employment, or to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement.

61.    Plaintiffs each requested exemption from the mandatory COVID-19 vaccination order to accommodate sincerely held religious beliefs placing Defendants on notice of the conflict presented between the work requirement and the sincerely held religious beliefs.

62.    At all times relevant hereto, each Plaintiff was performing competently in the position they held with the Defendants.

63.    Defendants took action or engaged in a course or pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of each Plaintiff's employment. As such, each Plaintiff suffered the adverse employment actions of discrimination including conduct that was and is reasonably likely to impair an employee's employment, job performance, or prospects for advancement or promotion.

64.    Plaintiffs are each informed and believe that the expression of their religious creed and the conflict between the person's religious belief or observance and the employment requirement was a substantial motivating reason and/or factor in Defendants' decision to take adverse employment actions against Plaintiffs.

65.    Defendants' conduct violates the Texas State laws against discrimination, and such violations were the legal and proximate cause in Plaintiffs' damage as stated below.

17

COMPLAINT FOR DAMAGES

66.    As a result of Defendants' actions against Plaintiffs, each Plaintiff suffered and continues to suffer harm and damages in the form of economic losses, including but not limited to, lost wages and employment benefits; and substantial emotional distress; and other economic and non-economic damages.

67.    As a result of the acts of Defendants as alleged herein, Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial. Plaintiffs request a reasonable award of attorney's fees and costs, including expert fees.

68.    In doing the things alleged herein, Defendants' conduct was despicable, and Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard of Plaintiffs' rights, entitling Plaintiffs to an award of punitive damages. The Defendants' conduct described herein was engaged in by managing agents for Defendants and/or ratified through its officers, directors, or managing agents against its employees.

## SECOND CAUSE OF ACTION

## RELIGIOUS DISCRIMINATION – FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS IN VIOLATION OF LABOR CODE §21.108 ET. SEQ.

### [Against All Defendants]

69.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 58 as though fully set forth herein.

70.    It is an unlawful employment practice, for an employer or other entity covered by this part to provide reasonable alternative means of accommodating the religious belief or observance that is in conflict with a work requirement.

71.    Plaintiffs each requested exemption from the mandatory COVID-19 vaccination order to accommodate sincerely held religious beliefs placing Defendants on notice of the conflict presented between the work requirement and the sincerely held religious beliefs.

72.    At all times relevant hereto, each Plaintiff was performing competently in the position they held with the Defendants.

73.    Defendants failed to provide reasonable alternative means of accommodating the religious belief or observance that is in conflict with a work requirement.

18

74.    Defendants then took action or engaged in a course or pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of each Plaintiff's employment. As such, Plaintiff suffered the adverse employment actions of discrimination including conduct that was and is reasonably likely to impair an employee's employment, job performance, or prospects for advancement or promotion.

75.    Plaintiffs are each informed and believe that the expression of their religious creed and the conflict between the person's religious belief or observance and the employment requirement was a substantial motivating reason and/or factor in Defendants' decision to not provide any available reasonable alternative means of accommodating the religious belief or observance that is in conflict with a work requirement, and Defendants taking adverse employment actions against Plaintiffs.

76.    Defendants' conduct violates Texas State law and such violations were a legal and proximate cause in Plaintiffs' damage as stated below.

77.    As a result of Defendants' actions against Plaintiffs, each Plaintiff suffered and continues to suffer harm and damages it the form of economic losses, including but not limited to, lost wages and employment benefits; and substantial emotional distress; and other economic and non-economic damages.

78.    As a result of the acts of Defendants as alleged herein, Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial. Plaintiffs request a reasonable award of attorney's fees and costs, including expert fees.

79.    In doing the things alleged herein, Defendants' conduct was despicable, and Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard of Plaintiffs' rights, entitling Plaintiffs to an award of punitive damages. The Defendants' conduct described herein was engaged in by managing agents for Defendants and/or ratified through its officers, directors, or managing agents against its employees.

///
///
///
///

19

**COMPLAINT FOR DAMAGES**

## THIRD CAUSE OF ACTION

## RETALIATION IN VIOLATION OF LABOR CODE §21.055 ET. SEQ.

### [Against All Defendants]

80.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 58 as though fully set forth herein.

81.    It is an unlawful employment practice, for an employer or other entity covered by this part to retaliate or otherwise discriminate against a person for requesting an accommodation for religious practice or disability, regardless of whether the request was granted.

82.    Plaintiffs each requested exemption from the mandatory COVID-19 vaccination order to accommodate sincerely held religious beliefs placing Defendants on notice of the conflict presented between the work requirement and the sincerely held religious beliefs.

83.    At all times relevant hereto, each Plaintiff was performing competently in the position they held with the Defendants.

84.    Defendants then took action or engaged in a course or pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of each Plaintiff's employment. As such, Plaintiff suffered the adverse employment actions of discrimination including conduct that was and is reasonably likely to impair an employee's employment, job performance, or prospects for advancement or promotion.

85.    Plaintiffs are each informed and believe that the expression of their religious creed and the conflict between the person's religious belief or observance and the employment requirement was a substantial motivating reason and/or factor in Defendants' taking adverse employment actions against Plaintiffs.

86.    Defendants' conduct violates the Texas State law, and such violations were a legal and proximate cause in Plaintiffs' damage as stated below.

87.    As a result of Defendants' actions against Plaintiffs, each Plaintiff suffered and continues to suffer harm and damages it the form of economic losses, including but not limited to, lost wages and employment benefits; and substantial emotional distress; and other economic and non-economic damages.

20

**COMPLAINT FOR DAMAGES**

88. As a result of the acts of Defendants as alleged herein, Plaintiffs have also incurred and continue to incur attorneys' fees and legal expenses in an amount according to proof at the time of trial. Plaintiff requests a reasonable award of attorney's fees and costs, including expert fees.

89. In doing the things alleged herein, Defendants' conduct was despicable, and Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard of Plaintiffs' rights, entitling Plaintiffs to an award of punitive damages. The Defendants' conduct described herein was engaged in by managing agents for Defendants and/or ratified through its officers, directors, or managing agents against its employees.

## JURY TRIAL DEMANDED

Plaintiffs respectfully demand a trial by jury and tender the jury fee.

## PRAYER

WHEREFORE, Plaintiffs seek judgment against Defendants, B. Braun Medical, Inc., and DOES 1-50, inclusive, as set forth in each cause of action and as follows:

1. For all actual, consequential and incidental financial losses, including but not limited to loss of earnings, benefits and other compensation, according to proof, in excess of $250,000, together with prejudgment interest in a sum in excess of the jurisdictional minimum of the District Court;

2. For compensatory damages;

3. Plaintiffs request a reasonable award of attorney's fees and costs, including expert fees pursuant to the Texas State law;

4. For costs of suit incurred; and

5. For such further relief as the Court may deem just and proper.

DATED: April 25, 2023

Respectfully Submitted,

WATKINS & LETOFSKY, LLP

*/s/ Daniel R. Watkins*
Daniel R. Watkins
CA SBN 163571 (Pro Hac Vice Motion Pending)
Michael Hamilton

21

COMPLAINT FOR DAMAGES

KY SBN 89471 (Pro Hac Vice Motion Pending)
Watkins & Letofsky, LLP
2900 S. Harbor Blvd., Suite 240
Santa Ana, CA 92704
Phone: (949) 476-9400
Fax: (949) 476-9407
Email:  dw@wl-llp.com
        mhamilton@wl-llp.com

*/s/ Travis Miller*
Travis Miller
Texas Bar No. 24072952
Defending the Republic
2911 Turtle Creek Blvd., Suite 300
Dallas, TX 75219
Phone: (214) 707-1775
Email: twm@defendingtherepublic.org
Attorneys for Plaintiffs

22

COMPLAINT FOR DAMAGES